I want to raise one point before I start my argument. An election concerning union representation is a very significant thing. It's somewhat different than a political election, but there are some similarities. The consequences, however, can be long-term, long-term for the employer, for the employees, and for the union. That's why the board has created a pretty good process for regulating how these elections are conducted. And essential to that process is that the elections themselves are to be conducted under certain laboratory conditions. It's actually a much higher standard than our political process. And from one who speaks for management, I think it works most of the time. It didn't in this case, and it didn't for three specific reasons. First, the NLRB engaged in a decision that cast the employer in a very negative light, which had some effects that I will get to in a second. But the decision is an indefensible decision. That the board itself claimed that the employer threatened employees where there is no factual support for the conclusion that the facts that are undisputed in the record are a threat. Secondly, there is no legal support for arguments of counsel in a context in a hearing which have some merit for being the basis of an unfair labor practice complaint because the Constitution gives the employer the right to petition the government in manners that in fact, in this case, the employer prevailed on. Yet, a very simple statement, one which in and of itself carries, I think, no threatening consequences, the board decided to, well, the union issued, filed an unfair labor practice. The investigation of this simple matter was conducted during the entire election campaign process and the result, which was an issuance of a complaint, the industrial equivalent of an indictment, was handed down right before the voters were to vote. And the employer contends there was no justifiable basis for the board's actions, that substantively, factually, and legally, the board should not have done what it did, that the board violated the constitutional rights of the employer and violated the statute itself because Section 8C of the National Labor Relations Act says that an employer's communications to employees cannot be a violation of the National Labor Relations Act unless it is a threat. And I submit that there is no reasonable interpretation of the single statement which is on the transcript of the representation case could be conceivably believed to be a threat. That's issue one. Issue two is that— Let me ask a question about that. Yes, sir. The language used, as I recall, had to do with it, well, that it was essentially voicing concern that the employees had not been—had not advised that they were being brought in to testify. And they didn't give you notice, employer notice, and the comment was made that—objecting to that and concluding with saying that that's not protected. I don't believe that's a protected act. What does that mean? Well, the employees are protected in many ways by the National Labor Relations Act. Unless there is a protection on the act, however, the employees do not have the protection of that act. What's the consequence? What does it mean that the employees are unprotected for not having given notice? Does that—the reasonable person conclude that that really is—that the employer cannot take action against those employees? Since they don't have protection? It's not clear under the law whether those employees are protected or not in doing what was done. It's clear the union should not have done it if the union did what— What does that have to do with it? I mean, the statements made by a person, a lawyer, a person of authority, in a sense to these employees, complaining that they are—showed up here to testify, you didn't tell your company about it, and I think that's—that may not be protective activity. And if I were an employee, I would be a little apprehensive about that. Well, Your Honor, if an employer had sat an employee down and articulated that, I would tend to agree with you that that would have not had any context-specific legal protection, which I think exists here when we're dealing with a statement made on the record in a proceeding unrelated to a communication with employees. In fact, there's no evidence in the record that any employee even heard that— I thought the employees were in the—maybe I misunderstood. I thought they were in the courtroom, and the comment related to the fact that they were scheduled to be working, and instead of working, without notice to the employer, they were in the hearing room, and the comment was, I thought, referring to the fact, well, they are missing their jobs, and that's not protected. I'm not sure, Your Honor, that it is in the record established that there were employees in the hearing room. They were in the hearing room at some parts of the proceeding. It also is unclear, and I think it's incumbent upon the Board to at least assert, that the employees heard the comment. I don't think there's any evidence in the record that the employee, any employee, ever heard a comment which essentially was, I don't think that what happened is protected. Whether they were there or not, I thought the import of the statement was, we can sanction these employees, punish these employees for not showing up at work, because it's not protected that they came in to testify. No, no, not at all. The import of the statement was, you have done things with the subpoena process, and you've disrupted the operation of the employer's facility. Because the employees are not on the job. Because the employees are not on the job, and we don't think that's protected, therefore it's not a legitimate reason for us not being able to produce additional witnesses. That was the total context of the discussion. It was at the, amongst the lawyers, it was, an employee was not even present testifying. Now, there may have been people in the hearing room, and I can't say for sure that they were at that time, because they were sequestered at one point. But even if they were, there is nothing that establishes that the statement was directed to them or was rationally understood by them to have been threatening. They all testified. Every witness who the union had brought to the hearing testified. There's no evidence in their testimony of any intimidation. There's no testimony that there was an intimidation, but more importantly, they freely testified, and they testified providing information that was helpful to the union in many respects during the process. I just don't believe that the after-the-fact construct here is a fair statement of a threat, because there was no threatening intent or effect, and it was presented as a petitioning of the government for a legitimate reason to establish, look, we can't produce an extra witness because we're shorthanded, and it's not our fault we're shorthanded. We didn't know we were going to have this disruptive process that occurred the day before the hearing. And in the context of a nursing home, you can't just not have employees. You have to have the employees there to tend to the residents. It's mandated by state regulation. Now, granted, you can have people called in. No question that you can, but you really kind of need to know, because your pool is a very limited pool. You seem to be arguing the seriousness of their absence, which really tends the government weight to the fact that that was a threat. No, not at all. We need those people there. Not at all. If we had wanted to threaten them, Your Honor, it would have been about the fact of their attendance, and they were not discouraged. In fact, they were encouraged to attend the proceeding. Nothing was said to discourage the participation in the process. And in fact, this would not have come up except for the union's representative insisting that the employer should have taken steps to ensure that there was coverage, even though we didn't know that there was not going to be a participation by the workers that were scheduled. In your view, what is the standard by which we review the decision of the board to file the unfair labor charge that they filed? Well, it's really—that's not the issue, Your Honor. The issue is did it have an effect on the election. Well, but to answer my question, they have substantial discretion as to manage the election, correct? They do. And to ensure that it be conducted in, quote, laboratory conditions, correct? They absolutely do. Okay. And so we were roughly reviewing their decision to uphold this particular election, right? Correct. Okay. And you want to undo that, I know. The second argument actually goes to the answer to your question. My question is what standard of review is owed that decision of the board to certify this election? Well, in this circuit, the standard of review for a refusal to grant a hearing for the objections that the employer files is de novo. That's trim core. And what we present is a case that shows there was, in fact, a wrong that occurred that could have affected the election. The effect, if we want to draw a modern-day comparison to the political process, is not unlike someone considering indicting one of the candidates for a prolonged period of time. And then all of a sudden, the day before the election, indicting. And that the public is cast against. And to add to that, that there's no legitimate basis whatsoever for the indictment. That it is absolutely barred by the First Amendment and by 8C of the Act. Even if the 8C provision allows a threat to be the basis for a charge, the First Amendment does not. And the Supreme Court has clearly said that in Bill Johnson's and B.E.N.K. that the threats in those cases were litigation. Serious costs that were to intimidate, in fact, intended to intimidate the union. But those were not sufficient because the process was protected. The petitioning process was protected from the board being able to act in that way. The board should have conducted a hearing, perhaps. The board should have conducted a hearing on the objections at which any factual disputes should have been allowed to be presented regarding the effect that it had on the election. There was ample evidence. I understand that you're, of course, you're answering a question, but you wanted to cover some other points and you're fast running out of time. I don't know whether you... I do, and I do want to make a point regarding the unit determination. It's clear from Specialty, Lundy, and Macy's that an initial determination of an appropriate unit has to be made. The board has wide discretion to do that. Once the initial determination is correctly made, whether it's by the union's petition, which did not happen in this case, or by the board actually finding an appropriate unit, that is a precondition for the imposition of the overwhelming community of interest standard to be applied to any other context. That you have to have that determination to open the gate to say that the board has choice of the unit components being the sole and exclusive basis for the decision. Haven't there been a number of decisions in which the LPNs have been excluded? Yes and no. At nursing homes. They have, but the problem here is not that they can be excluded, but how they were excluded. What happened here is that before there was a determination of the appropriate unit, before there was an analysis of it determining the status of the LPNs, the board said they were excluded under the overwhelming community of interest standard. That's what the regional director says in her decision, R354, that if you, she first finds that the unit's inappropriate, it's 254, excuse me, and then she says that the burden to determine how they should be included is by the overwhelming community of interest standard. That's inappropriate in this context. All right. Your initial time has expired, Mr. Marlin. You've saved time for rebuttal. Ms. Beard? May it please the court, I'm Heather Beard, and I represent the National Labor Relations Board. I'm going to start by discussing the board within its discretion overruling the center's election objection and why that was proper and reasonable, and then I'll discuss the unit determination. So to begin, we agree that the board has a pretty good process here, and that's exactly what the board followed. So to address my opposing counsel's statement with regard to the threat, I want to make something very clear. The threat in that threat or not during the course of the representation hearing resulted in an unfair labor practice charge that the union had every right to file and that the region had every right to investigate. That particular unfair labor practice determination had an investigation which went forward, and the issue before this court, however, is whether anything that the region did in that investigation and issuance of complaint tended to destroy the laboratory conditions of the election. And what we have here is a failure of proof on the part of the employer to demonstrate, as the employer must, a proffer in order to get an evidentiary hearing that specific events, specific people engaged in specific actions that would tend to overthrow this election, which is extremely important and has long-lasting ramifications. Indeed, the employees who voted for the union in this matter have waited now for two years while we go through these proceedings. So in terms of whether or not what was said by Mr. Ahmad in the hearing was a threat, the issue is whether there was a legitimate basis to investigate. That's what the region did. The region investigated whether or not in the standard for a threat in the National Labor Relations Board is whether objectively a reasonable employee would understand that to be a threatening behavior. And any defense that Mr. Ahmad may have to such an unfair labor practice, such as it was my First Amendment right to say whatever I want in a representation hearing, any of those defenses are defenses he was and did and was free to raise in the unfair labor practice proceeding. But that does not mean in this circuit or anywhere else that he is relieved of his burden of demonstrating any effect on the election. So I would point this Court to a case we cite in our brief called Osborne. It's on page, I believe, 44 of our brief. And in the Osborne case in this circuit, the Court agrees with what was in Mr. Ahmad's opening original brief, which is that just investigating an unfair labor practice while we're in the pre-election period in another case, there's nothing wrong inherently with that. And indeed, that happens all the time. A union would be able to tell the Board that it wasn't doing its job if it didn't investigate an unfair labor practice. So all we have going on is the region investigating a case, and we've got no facts, no specific events that have been proffered to the region or to the Board about what was wrong with this investigative process. Indeed, the complaint which was issued and then mailed through standard regional processes to the employer was mailed the day before the election. However, unlike the analogy of the indictment in the political world that my opponent raises, we would not have this broadcast on television, and indeed there's no allegation other than this was mailed to Mr. Ahmad. There's no allegation that any of the employees knew the day before the election that this occurred. And so because what we're talking about is an unfair labor practice investigation, and then for purposes of overturning the will of the voters, we did the employer allege specific events, specific people that would give the employer a hearing. And so that brings me to what is the standard in this circuit. We stand by our brief that the Golden Age Abusive Discretion Standard is the first panel decision in this court to address that issue. It has not been overturned. And in fact, Golden Age was decided under a version of a rule that did not explicitly have the phrase regional director's discretion in it. But nonetheless, I'm standing up here for the Board and saying that under either standard, indeed in Hood, the court said that considerable weight must be given by the court to whether or not the regional director found substantial material issues for there to be a hearing. And under either standard, those material issues are absolutely not here. And therefore, we believe that the region was absolutely correct in looking at the evidence submitted by the employer and determining it wasn't sufficient to warrant that there was any tendency to have any effect on the election. And I'd also like to address Judge Owen's question about the employees and whether or not they were in the hearing room. Again, this goes to whether or not it was a threat. Whether or not employees were there would be something that the region would investigate in its questioning. And I'd just like to point out that throughout the course of this case, Mr. Mott has never alleged that there weren't employees in the courtroom at that time. In fact, questions from the region when they did their investigation assumed and said, for example, and Mr. Mott never answered that they were not in the room, they asked was your statement a threat made to the employees present at the representation hearing and how did the employees present at the representation hearing affect the employer's work production that day? So what this also demonstrates is what the region was doing is being fair. The region was trying to figure out could these employees who had been sitting here, being subpoenaed under the board's regular processes, could they be in violation of 8G of the Act? Did they disrupt production? So what happened was an investigation like any other that the region conducts, and the region conducted the investigation, issued the complaint, and the employees voted for the union. So insofar as that election objection is concerned, we believe that the board acted well within its discretion. Unless you have other questions on that, I'd like to move to the unit determination portion. Okay, so all I'd like to say with regard to the unit determination is that the regional director here and the board after her followed specialty health care, which has recently been affirmed by this circuit in Macy's, followed it to a T when performing what needs to happen with these cases, which is determine an appropriate unit. Not the most appropriate unit, not the best unit, an appropriate unit. And what the regional director did here is look at all of the individual classifications in the petitioned for unit and determined, as specialty calls for, whether or not they were readily identifiable as a group, shared community of interest, and she determined that actually the union's petitioned for unit did not. It was not a readily identifiable group. She determined an appropriate unit would be all of the service and maintenance employees, not including the licensed practical nurses, and then proceeded to examine the employer's evidence because the employer was the party who was seeking to include those employees, and determined on the record the employer didn't meet the burden. And all of this in her decision, and as we show in our brief, was done pursuant to the law and came up with an appropriate unit that was consistent not only with the evidence in this case but with precedent that the board has also ruled on before. And so we think that because the unit determination was one that was an appropriate unit and because the board reasonably overruled the election objection, that this court should uphold the election which resulted in the employees voting for the union. Thank you. All right, thank you, Ms. Beard. Mr. Davies? Good morning. May it please the Court, my name is George Davies, and I represent the Retail, Wholesale, and Department Store Union, the intervener in this case. In the brief time I have, I want to make several, I think, overarching points with respect to this case. First, all of the four employees that were subpoenaed were subpoenaed pursuant to the NLRB's rules and regulations. There's no evidence, absolutely none, in the record that the employers produced that the union somehow staged some form of work stoppage by using these subpoenas to cause an understaffing of the facility that would somehow violate Section 80 of the Act. There's simply no evidence. There's no evidence, absolutely none, that the ULP charge, the unfair labor practice charge, that was filed by the union was filed in bad faith. In fact, that's not true, and I'll point out some reasons for that as I proceed. And finally, and I think foremost, there's no evidence that the union in Region 15 and the NLRB engaged in some nefarious conspiracy to deny the employer its First Amendment rights or interfere with the election in favor of the union as suggested by the employer in its brief. First, it's well settled, and NLRB case law makes clear, that employees who are subpoenaed for a board hearing an employer's obligation is one of non-interference, non-restraint, non-coercion, and non-reprisal. It is also well settled that the threat of reprisal or discipline directed toward an employee for complying with the subpoena constitutes an unfair labor practice. Now, the counsel for the employer is fully aware of this well-settled law, and he was fully aware that the witnesses were tending pursuant to validly issued subpoenas. Complying with a validly issued subpoena in these circumstances can hardly be characterized as a violation of Section 80 of the Act, and the employer produces no cases that such is the case. And by making the statement, and it is a threat that a reasonable person can interpret as a threat, the employer counsel seems to fail to recognize, one, the employers were validly subpoenaed. So why make this statement in the presence of subpoenaed employees and their union representative unless it was intended to be perceived as a threat for participating in the NLRB's processes and to supporting the union? Essentially what the employer is saying here is that by complying with the validly issued government subpoena at the request of the union, in other words, assisting or supporting the union, you could be disciplined. This is and was perceived as a threat by the employees, and accordingly, the union's charge was not baseless. It had merit. The NLRB— How was it communicated to the employees? Excuse me? How was the threat communicated to the employees? The threat was communicated to the employees. As I understand it, there were employees in the courtroom or in the hearing room, if you will. It was communicated to the union's representative, who was a union representative who had subpoenaed those employees to come to the hearing. That's how I understand it was subpoenaed, how it was passed, if you will, or heard by the employees. Now, I think, as I'm running out of time here, I want to make one point, one last point. The employer's argument that because the complaint issued on 12-31, on December 31, on New Year's Eve, that the timing somehow interfered with the election. But there's a glaring admission in its brief, its opening brief at page 47, where it says the complaint could have issued the day after the election without affecting the election, meaning the complaint could have issued on January 4 without affecting the election. This undercuts the employer's entire theory that the charge and the investigation somehow interfered with the election or spoiled the laboratory conditions prior to the January 3 election. And the employer provides no evidence of how a complaint issued on New Year's Eve and received on January 2, instead of being issued on January 4, affected the outcome of the election. As Ms. Beard said, there's no evidence that any employees knew about the complaint, read the complaint, were apprised of the complaint prior to the election. Therefore, the analogy that Mr. Mott made when he started his argument simply doesn't hold. Thank you. Thank you, Mr. Davies. Mr. Mott, you've saved time for rebuttal. As to the unit determination issue, Your Honors, the board clearly could have done it correctly. We're not challenging specialty or Macy's or Lundy. We're just saying that in order to do it correctly, you can't interject an analysis for inclusion or exclusion using the overwhelming community of interest standard until someone has provided a presumptively appropriate unit. The protections of those cases rests upon there can be many appropriate units, there has to be an establishment of one as your threshold determination, and then you argue exclusion or inclusion using the overwhelming community of interest standards once you have that baseline. Secondly, the charge itself and the investigation did directly interfere with the employer's pre-election ability to communicate with the employees. It took a huge area out of discussion for fear that there would be additional charges. The employer could not even explain what had occurred at the hearing, couldn't even undercut the accusations that the union was saying. How was the accusation? Was there evidence that it was communicated to the employees that there was a complaint before the election? I think so, but how could there not have been? The charges certainly were pending, and there were three amended charges during the course of the investigation. And I'm saying that the employer could not react to the substantive complaints against it for fear another charge would be filed against it. I'm confused. They say the first notice you got was it was mailed 12-31 to you. The complaint, the actual investigation lasted the entire pre-election period. The complaint issues right at the eve of the election. There is no tactical substantive reason for doing that at all. There's no advantage to the employer, to the union, to the board. Why didn't they wait until after the election? I submit they knew why. They wanted to affect the election, and it did have an election effect. If two votes changed in this process, the result would change. If two votes for the union were changed. Do you agree that if they'd sent it the day after that we wouldn't be here? We wouldn't be here on that argument, yes. That's correct. How and when was something communicated to any voters? The problem with the other aspect of the imposition is upon the employer's free speech rights during the campaign. If it had a right to communicate concerning the 8G issue. See, I'm confused. You lost me. You said if it had been mailed a different day we wouldn't be here. The issuance of the complaint, on that issue we would not be arguing that. But the other issue is the fact that the employer was intimidated during the entire pre-election campaign from even discussing the merits of the issue because it had resulted, the mere saying maybe this is not protected had resulted in an unfair labor practice charge. Now an employer in a health care setting I think has the right to say, you know, if you don't comply with 8G, you run the risk of some dangerous things and unions have historically failed to do it correctly because it's complicated. And you don't want to get involved in taking the advice of a labor organization that could get a result that's not a very good result. And there are cases where employees have lost their jobs because they followed the union's advice concerning not complying with the requirements of 8G. Now, that's not what we ever said at the hearing. All we said is we didn't think that it was a protected act. Now, nobody was disciplined. No intent to discipline ever existed. There's no even evidence that there was an employee who heard it. Now, perhaps if those are the arguments the board wants to make, the union wants to make, they should have had a hearing. They should have had a hearing on the objections where all these fact issues could have been addressed, where we could have had the entire context explored. But no, the board concluded that this was an unfair labor practice and denied the employee the hearing because they claimed that the whole issue was the employer's fault. It's only the employer's fault if you conclude that the employer did something wrong. And the Constitution and Section 8C of the Act says that cannot be the case. Thank you. All right, thank you. Mr. Mott, your case is under submission. Thank you, Your Honor. Case for today, Kabbalah v. Supreme Production Services.